# In the United States Court of Federal Claims

No. 24-1072
Filed: November 8, 2024[*]
FOR PUBLICATION

**ACUITY-CHS MIDDLE EAST LLC,**

    *Plaintiff,*

**v.**

**UNITED STATES,**

    *Defendant,*

**and**

**KBR SERVICES, LLC**

    *Defendant-intervenor.*

*Paul Farid Khoury*, Wiley Rein LLP, Washington, DC, *J. Ryan Frazee*, *W. Benjamin Phillips, III and Morgan W. Huston*, Wiley Rein LLP, for the plaintiff.

*Matthew Paul Roche*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *Kathleen D. Martin*, Department of State, of counsel, for the defendant.

*Jonathan Michael Baker*, Crowell and Moring LLP, Washington, DC, *Eric M. Ransom, James G. Peyster*, *Zachary H. Schroeder*, Crowell and Moring LLP, for the defendant-intervenor.

## MEMORANDUM OPINION

**HERTLING, Judge**

    In this bid protest, the plaintiff, Acuity–CHS Middle East LLC ("Acuity"), a current contractor to the Department of State ("State"), challenges a determination by a State contracting officer that Acuity has an organizational conflict of interest ("OCI"). Acuity alleges this

---

[*] Pursuant to the protective order in this case, this opinion was filed under seal on October 29, 2024, and the parties were directed to propose redactions of confidential or proprietary information by November 5, 2024. The parties did not propose any redactions. Accordingly, the opinion is released in full.

determination prevents it from participating as a subcontractor in a procurement for the services Acuity currently provides.

Acuity is the incumbent contractor providing medical services to State's missions in Iraq under the Medical Support Services Iraq ("MSSI") contract. An Acuity-affiliated company, Janus Global, LLC ("Janus"), provides protective services under the Worldwide Protective Services III ("WPS-III" or "WPS") contract.

In February 2024, State determined that the services Acuity was providing through the standalone MSSI contract would, in the future, be provided through a task order under State's Diplomatic Platform Support Services ("DiPSS") multiple award indefinite delivery indefinite quantity ("IDIQ") contract. This task order would be called the MedSSI task order. Because Acuity does not hold a DiPSS contract, it would need to become a subcontractor for a DiPSS contractor to continue providing the medical services in Iraq it was performing under the MSSI contract. Neither of the DiPSS contractors with whom Acuity had hoped to partner ultimately submitted a proposal for the MedSSI task order. That task order was awarded to the defendant-intervenor, KBR, Inc. ("KBR") on May 7, 2024.

A different contracting officer than the one responsible for the MSSI contract was responsible for the MedSSI task order. Beginning in March 2024, the MedSSI contracting officer started to suspect that Acuity may have had an OCI because, under the MSSI contract, it was responsible for conducting drug testing of U.S. diplomatic and contractor personnel in Iraq, including the personnel of its affiliated company, Janus. To prevent the loss of services during the period between the discovery of Acuity's OCI and the commencement of work under the MedSSI task order, State issued a waiver for the OCI which allowed Acuity to continue to perform for the duration of its MSSI contract.

To avoid a similar OCI in the MedSSI task order, on March 13, 2024, the MedSSI contracting officer contacted all DiPSS contractors to inform them that DiPSS contractors also holding a WPS contract would be precluded from participating in the MedSSI competition in any capacity. The contracting officer's formal decision reflecting his OCI determination for Acuity was issued on May 19, 2024, after the MedSSI task order had been awarded to KBR.

Acuity filed this protest challenging the contracting officer's May 19, 2024, OCI determination that contractors holding, directly or through their affiliates, a WPS-III contract could not compete for the DiPSS MedSSI task order. Acuity argues that the decision arbitrarily and capriciously prevented it from participating in the task order in violation of Federal Acquisition Regulation ("FAR") 9.5.[1]

---

[1] The plaintiff alleges a violation of FAR 9.5, the section governing organizational conflicts of interest, in its motion for judgment on the administrative record. In relevant part here, FAR 9.504(e) provides: "The contracting officer shall award the contract to the apparent successful offeror unless a conflict of interest is determined to exist that cannot be avoided or mitigated."

Acuity did not submit a proposal for the task order because it could not, as it does not hold a DiPSS contract, and neither of its prospective partners submitted an offer. Nonetheless, Acuity protests State's OCI determination and rejection of Acuity's proposals to mitigate the OCI, alleging they violate the FAR. Acuity argues that the Federal Circuit's recent decision in *Pericpient.ai, Inc. v. United States*, 104 F.4th 839 (Fed. Cir. 2024), affords both the Court of Federal Claims jurisdiction to consider the protest and Acuity standing to pursue it. The defendant and KBR have both moved to dismiss, arguing that there is no jurisdiction to consider Acuity's claim and that Acuity lacks standing.

Acuity lacks standing because it could not submit an offer for the task order, and neither of its prospective partners opted to submit an offer. It can neither establish that it has a redressable injury under Article III nor that it is an "interested party" as required for standing under 28 U.S.C. § 1491(b)(1). Accordingly, the defendant's and defendant-intervenor's motions to dismiss are granted.

I. **FACTUAL BACKGROUND**

Since 2013, Acuity has provided medical support services to State in support of State's missions in Iraq. (AR 377.) While it currently provides those services under the MSSI contract, State decided in 2024 to reprocure the services as a task order under the DiPSS contract. (AR 142.)

While Acuity began performing services under the MSSI contract in 2013, one of its affiliated companies, Janus, began to provide security services for State under the WPS-III contract several years later.[2] (AR 16.) Janus employees are subject to routine drug testing, which is administered by Acuity employees under the MSSI contract. (AR 994.) Acuity also provides skills verification of other State contractors under the MSSI contract. (*Id.*)

A. **Solicitation and OCI Investigation**

The statement of work ("SOW") for DiPSS, the IDIQ contract vehicle under which State issued the MedSSI task order, notes that DiPSS contractors will provide "a full range of services for [l]ife [s]upport services, [l]ogistics [s]ervices . . . and [o]perations and [m]aintenance," but the DiPSS SOW did not explicitly include medical services among the items it covers. (AR 1689.) Although Acuity was eligible to bid on the DiPSS contract when it first opened in 2019,

---

[2] The administrative record contains only Janus's current WPS contract, which has an effective date of January 4, 2023. The plaintiff noted in its opening brief that Janus has provided services under the WPS contract since 2016 (ECF 28-1 at 9), and the defendant noted in its brief that Janus has provided services under the WPS contract since 2017 (ECF 32 at 12). In either case, the record does not reflect that Acuity's OCI with Janus was present at the time Acuity began performing services under the MSSI contract in 2013.

it did not do so because it "did not understand DiPSS to encompass the MSSI requirement."[3] (ECF 28-1 at 9.)

In February 2024, State decided to solicit proposals for the MedSSI task order under the DiPSS contract. (AR 142.) The record does not reflect the reason for State's decision but, given the timing, the decision does not appear to be related to Acuity's OCI on the MSSI contract, as that was only discovered later. Later that month, State issued two requests for information ("RFI") to all DiPSS contract-holders. (AR 142; AR 181.)

Although Acuity does not hold a contract under DiPSS, it hoped to continue providing the work it performs under its MSSI contract as a subcontractor to a DiPSS contract-holder awarded the MedSSI task order. Acuity therefore identified two possible partners holding DiPSS contracts. Acuity's first prospective partner, DiPSS Contractor 1, began corresponding with State in April 2024 about its potential participation in the MedSSI solicitation. DiPSS Contractor 1 objected to State's exclusion of WPS contractors as an unnecessary restriction on competition. (AR 482-83.) Before State could respond to DiPSS Contractor 1's complaint, however, DiPSS Contractor 1 wrote again to the contracting officer that it would decline to submit an offer because it could not otherwise meet the experience requirements of the MedSSI task order. (AR 616.)

A second potential partner for Acuity, DiPSS Contractor 2, corresponded with the contracting officer in February, March, and April 2024 about its potential participation in the MedSSI solicitation. (*See* AR 181; AR 320; AR 543.) DiPSS Contractor 2 never submitted an offer for the MedSSI task order, and its failure to submit an offer is not explained in the record.

After receiving the RFI, another DiPSS contractor that also held a WPS-III contract wrote to the contracting officer on February 24, 2024, to inquire "whether holding both the MedSSI and WPS Baghdad Mobile would create an OCI, since there could be a situation where our employees on MedSSI would be responsible for drug testing our employees on WPS." (AR 245.) The contracting officer responded four days later. The contracting officer advised that DiPSS contractor that a contractor holding both the MedSSI task order under DiPSS and a contract under WPS-III would have a "significant conflict of interest," because the MedSSI contractor would collect urine specimens for drug-testing and provide skills-verification exams to its affiliated employees servicing the WPS-III contract. (*Id*.) The contracting officer concluded that this OCI created a significant potential for "impaired objectivity." (*Id.*)

In its March 1, 2024, response to the contracting officer, the DiPSS contractor provided information about an OCI determination from 2022 with facts the contractor thought "very similar to th[e MedSSI-WPS-III] situation." (AR 244.) In that 2022 determination, a State contracting officer had found a substantial OCI risk that "require[d] exclusion of all WPS contractors from participating" in that acquisition. (*Id.*) The MedSSI contracting officer

---

[3] This explanation is not part of the record and is reflected only in Acuity's briefing. It is included only to provide background, but the explanation is not relied upon for any purpose.

contacted the contracting officer responsible for the 2022 OCI determination for guidance, explaining that "the reasoning for your earlier letter . . . seems to be very similar." (AR 305.)

On March 13, 2024, the contracting officer emailed all DiPSS contractors to explain his conclusion regarding the existence of an impaired objectivity OCI between affiliated MedSSI and WPS-III contractors and alerted potential MedSSI offerors to State's consequent decision to exclude WPS-III contractors from competing for or participating in the MedSSI task order. (AR 317.) In a separate email, the contracting officer contacted DiPSS contractors to remind them that the experience criteria for the MedSSI task order, as well as all other DiPSS task orders, required them to possess an Iraqi business license. (AR 432.)

State released the solicitation for the MedSSI task order on May 7, 2024. The "Instructions to Offerors" noted that State "has determined that [WPS] contractors, partners, subcontractors, etc. are precluded from participating in the MedSSI competition as a prime, partner, subcontractor, etc." (AR 662.)

### B. Correspondence with Acuity about the OCI

On March 3, 2024, shortly after the February 2024 correspondence between the MedSSI contracting officer and the DiPSS contractor, the MSSI contracting officer contacted Acuity to raise the OCI arising from its affiliation with Janus. (AR 253.) The MSSI contracting officer, a different individual than the MedSSI contracting officer, asked Acuity whether it had ever disclosed that OCI to State. (AR 253.) On March 5, 2024, Acuity responded that, while it had considered the potential for an OCI, it "determined the rigors of the drug screening process virtually eliminate[d] any risk of a conflict of interest." (AR 252.) Acuity described its drug-testing and screening processes and explained why it believed those processes eliminated any risk of an OCI. In response, the MSSI contracting officer noted his disagreement with Acuity's position and asked Acuity to provide "any information Acuity wants to be considered, including mitigation plans," as he made a formal determination about the existence of an OCI. (AR 313.)

Acuity provided additional information on March 19, 2024. (AR 377-82.) It took the position that, for several reasons, the drug testing program's "performance requirements do not permit Acuity to exercise any discretion that could give rise to an OCI." (*Id.*) First, Acuity does not choose which employees it screens and is not aware of an employee's affiliation after conducting the testing. (*Id.*) Second, test results are binary: a result can only be "negative" or "non-negative" and do not require interpretation. (*Id.*) Third, a Government Technical Monitor is "generally present" when urine samples are collected to ensure that WPS contractors are meeting their technical requirements. (*Id.*) Fourth, an independent lab verifies the results of all drug tests. (*Id.*)

Beyond these existing "safeguards," Acuity proposed additional mitigation strategies. These were: requiring that a Government Technical Monitor be present at every test site, rather than operating on the assumption that one is "generally present"; removing from an employees' drug-testing paperwork a form that could potentially reveal the identity of an employee's employer to a Medical Review Officer; and, at Acuity's cost, hiring a third-party Medical Review Officer to audit all non-negative results from the past three years of testing. (AR 381-

82.) Acuity concluded by requesting a meeting "with the relevant stakeholders for each program to specifically address the [stated] issues" if the contracting officer determined that Acuity's current and proposed procedures were insufficient to avoid an OCI.  (AR 382.)

After receiving Acuity's response, the MSSI and the MedSSI contracting officers consulted with the WPS contracting officer.  (AR 427-28.)  As they "ha[d] no detailed knowledge or history of [the] WPS task order," they solicited the WPS contracting officer's input.  (AR 427.)  Specifically, they asked the WPS contracting officer to assess the accuracy of Acuity's statements about the Government Technical Monitor's role in the drug-testing process.  (*Id.*)

On March 27, 2024, Acuity followed-up with the MedSSI contracting officer to inquire whether the information it provided in its March 19, 2024, communication and the proposed additional mitigation measures satisfied State.  Acuity also asked whether the MedSSI contracting officer was willing to speak with Acuity staff by phone to address the OCI issue further.  (AR 781.)  The MedSSI contracting officer replied that Acuity's response was under review and declined to schedule a call.  (AR 779.)  After a second request to meet from Acuity, the MedSSI contracting officer informed Acuity on April 5, 2024, that even if Acuity's proposed mitigation measures were accepted by State to allow Acuity to complete the current MSSI contract, "it would not necessarily mean that the determination on MedSSI would change."  (AR 778.)

On May 19, 2024, the MedSSI contracting officer issued a final OCI determination.  He concluded that Acuity had an impaired objectivity OCI and that its proposed mitigation strategies were "insufficient" to overcome the OCI.  (AR 787-91.)  He explained that all of Acuity's proposed mitigation measures would "require additional burden and cost to be placed on the [g]overnment, which [was] not currently available."  (AR 789.)  The contracting officer also concluded that disallowing WPS contractors from participating in the MedSSI procurement would not decrease competition, because he found that it would only eliminate one out of 20 DiPSS contract holders (the contractor that in February 2024 had first raised the OCI concern) from competing for the MedSSI task order.  (*Id.*)

### C.   Contract Award

After receiving two proposals that fulfilled the solicitation requirements, State awarded the MedSSI task order to KBR in June 2024.  (AR 1676.)  Because of the limited time remaining on the MSSI contract, State waived the OCI to allow Acuity to continue fulfilling its obligations "until a follow-on task order is awarded, and services are transitioned."  (AR 1007.)  Implementation of the MedSSI task order has been voluntarily stayed during the pendency of this protest.

## II.   PROCEDURAL HISTORY

The plaintiff filed this protest on July 15, 2024.  (ECF 1.)  It moved for judgment on the administrative record on August 15, 2024.  (ECF 28.)  On August 29, 2024, the defendant and KBR each moved to dismiss and cross-moved for judgment on the administrative record.  (ECF

32; ECF 33.)  The plaintiff responded on September 6, 2024, (ECF 34), and the defendant and KBR replied on September 13, 2024.  (ECF 35; ECF 36.)  Oral argument was held in Washington, DC on October 10, 2024.  At the conclusion of the oral argument, the Court announced it would dismiss the protest and would provide its reasons in writing.

### III.     JURISDICTION AND STANDING

The Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

To file a protest under § 1491(b), a plaintiff must first satisfy the standing requirement of Article III of the Constitution.  *Land Shark Shredding, LLC v. United States*, 842 F. App'x 594, 596 (Fed. Cir. 2021) (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009); *see also Freytag v. Commissioner*, 501 U.S. 868, 888 (1991) (non-Article III "courts exercise the judicial power of the United States").

To have standing to bring a bid protest, a plaintiff must also satisfy the requirement to demonstrate statutory standing as an "interested party."  28 U.S.C. § 1491(b)(1); *see CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1152 (Fed. Cir. 2023).  A plaintiff that establishes standing under Article III must still meet the "more stringent" statutory requirement of showing that it is an "interested party" according to 28 U.S.C. § 1491(b)(1).  *Weeks Marine, Inc.*, 575 F.3d at 1359.  To establish its statutory standing under § 1491(b)(1), a plaintiff must allege facts which, if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  Courts have typically summarized a bid protester's obligations as three-pronged: to bring a protest, a plaintiff must be challenging (1) a solicitation by a federal agency; (2) an award or proposed award of a contract; or (3) any alleged violation of statute or regulation in connection with a procurement or proposed procurement.  *See, e.g.*, *Percipient.ai*, 104 F.4th 846; *22nd Century Tech., Inc. v. United States*, 57 F.4th 993, 998 (Fed. Cir. 2023).

An offeror can demonstrate it is an interested party with a direct economic interest in a post-award bid protest by "show[ing] that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see CACI, Inc.-Fed.*, 67 F.4th at 1152.  The "substantial chance" test does not require a plaintiff to show that, but for the agency's alleged error, it would have been next in line for the contract award, but the plaintiff must still demonstrate that it had "more than a bare possibility of receiving the award" to have standing.  *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005)).

A protest brought by a plaintiff without constitutional standing must be dismissed under RCFC 12(b)(1).  *Associated Energy Grp., LLC v. United States*, 172 Fed. Cl. 799, 810 (2024).  A

protest brought by a plaintiff without statutory standing must be dismissed under RCFC 12(b)(6). *CACI, Inc.-Fed.*, 67 F.4th at 1151.

In addition to demonstrating that it has standing, a plaintiff must show that it was prejudiced by the errors it alleges to prevail.. The existence of prejudice is a factual question. *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015).

Historically, prospective subcontractors like Acuity have lacked standing to pursue bid protests. *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("*AFGE*"). In addition, under the Federal Acquisition Streamlining Act ("FASA"), 41 U.S.C. § 4106(f)(1), the Court of Federal Claims lacks jurisdiction to hear protests challenging the issuance or award of a task order. *SRA Intern., Inc. v. United States*, 76 F.3d 1409 (Fed. Cir. 2014). The Federal Circuit's recent decision in *Percipient.ai*, however, opens a path forward for a narrow subset of subcontractors.

In *Percipient.ai*, the Federal Circuit held that the FASA task-order bar did not prevent a supplier of commercial software from challenging a task order that the supplier alleged violated a statutory preference for products available commercially and a statutory obligation for the procuring agency to conduct market research. 104 F.4th at 847-48. Although FASA bars protests "in connection with the issuance or proposed issuance of a task or delivery order," 41 U.S.C. § 4106(f)(1), the Federal Circuit majority held that the plaintiff's claim was "directed to [the agency's] violation of [the statute] and related regulations after issuance of the task order." *Percipient.ai*, 104 F.4th at 847. Percipient.ai neither protested the agency's decision in issuing the task order nor sought to change anything about the task order itself. In that context, the Federal Circuit majority held, the Court of Federal Claims could exercise jurisdiction over the plaintiff's protest because it involved contract administration, not the issuance of the task order. *Id.*

In deciding whether Percipient.ai could, as a subcontractor, establish that it had standing, the Federal Circuit distinguished Percipient.ai's protest from the one at issue in *SRA International*. *Id.* at 851-51. The *Percipient.ai* majority concluded that when a subcontractor "[1] invoking only prong three of the jurisdiction under 28 U.S.C. § 1491(b)(1), [2] asserts a violation of 10 U.S.C. § 3453 [3] without directly or indirectly challenging a solicitation for or [an] actual or proposed award of a government contract," the subcontractor is an interested party. *Percipient.ai*, 104 F.4th at 853. The *Percipient.ai* court limited its holding to the *sui generis* scenario before it. It emphasized that subcontractor standing was potentially available only when the protest "is, and must be, based solely on the third prong" of bid-protest jurisdiction—the protest alleges a "violation of statute or regulation in connection with a procurement or a proposed procurement." *Id.* at 855 (referring to 28 U.S.C. § 1491(b)(1)).

Turning to the question of subcontractor standing, the Federal Circuit majority distinguished prior cases rejecting subcontractor standing under § 1491(b)(1) by noting that earlier cases had implicated claims under the first two prongs of the statute—protests challenging either (1) the solicitation or (2) the contract award. *Percipient.ai*, 104 F.4th at 855. Although *AFGE* had involved a protest under the third prong of § 1491(b)(1), the plaintiff in that case had also challenged the contract award. 258 F.3d at 1297. The *Percipient.ai* court specifically

8

distinguished *AFGE* for this reason and explained that the path it was creating for subcontractors to obtain standing in limited instances did not apply in cases in which, even though a plaintiff may have asserted a challenge to a procurement under the third prong of § 1491(b)(1), the plaintiff also could have brought its challenge under the first or second prongs of § 1491(b)(1). In such cases, the prohibition on subcontractor standing laid out in *AFGE* continues to apply. *Percipient.ai*, 104 F.4th at 855.

## IV.     STANDARDS OF REVIEW

Both defendants move to dismiss the protest for lack of jurisdiction and lack of standing pursuant to RCFC 12(b)(1). Under RCFC 12(b)(1), a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). It is the plaintiff's burden to establish by a preponderance of the evidence that subject-matter jurisdiction exists. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When a plaintiff's asserted jurisdictional facts are challenged, only those factual allegations that the defendant does not controvert are accepted as true. *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). A court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts and may review evidence outside the pleadings. *Id.* (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)).

In addition, KBR has moved to dismiss pursuant to RCFC 12(b)(6). It argues that the plaintiff forfeited its claim under *Blue & Gold Fleet v. United States*, 492 F.3d 1308 (Fed. Cir. 2008) by failing to challenge the terms of the solicitation and task order prior to the award of the task order. *See M.R. Pittman Group, LLC v. United States*, 68 F.4th 1275, 1280 (Fed. Cir. 2023) (*Blue and Gold Fleet* dismissal is under RCFC 12(b)(6)).

Dismissal for failure to state a claim upon which relief can be granted "is appropriate when the facts asserted by the claimant do not entitle [the claimant] to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). A court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiff is entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Because the protest is dismissed for lack of standing, the standard of review for motions for judgment on the administrative record is not addressed.

## V.     DISCUSSION

### A.     Parties' Arguments

Acuity contends in its complaint that, through State's OCI determination, State is "improperly prohibiting offerors from subcontracting with responsible, high-performing

vendors." (ECF 1 at 16.) It argues that although FAR 9.504(a)(2) requires contracting officers to first attempt to "avoid, neutralize, or mitigate significant potential conflicts" before excluding vendors, the MedSSI contracting officer broadly opted to exclude all WPS contractors from participating in the task order. (*Id.* at 17.) Acuity does not challenge State's decision to move the MSSI contract work to the MedSSI task order. Instead, Acuity focuses solely on the effect of the OCI decision on its ability either to participate in, or perform under, the MedSSI task order procurement as a subcontractor.

In its opening motion for judgment on the administrative record, Acuity briefly explained that its standing to bring the protest and the court's jurisdiction to hear it arise from the decision in *Percipient.ai*. Acuity focuses on its allegation that the contracting officer violated the requirement of FAR 9.5 that State reasonably consider and mitigate the OCI identified in Acuity's performance of the MSSI contract to allow it to participate as a potential subcontractor to a DiPSS contractor on the MedSSI task order. (ECF 28-1 at 27.) Acuity argues that the contracting officer's refusal to consider reasonable mitigation efforts is arbitrary, capricious, an abuse of discretion, and not in accordance with the law. (*Id.* at 18.) Acuity thus comes within *Percipient.ai*'s window for subcontractor standing and exception to the FASA task-order bar. As a result, Acuity argues it is entitled to a permanent injunction "requiring the [a]gency to allow mitigation or avoidance of any perceived OCIs . . . so that Acuity can participate in this program as a subcontractor." (*Id.* at 36.) It further requested the issuance of a "declaratory judgment finding unlawful the [a]gency's decision to exclude Acuity as a subcontractor under MedSSI." (*Id.* at 39.)

In response, the defendants moved to dismiss the protest on two grounds. First, they argue that the Court of Federal Claims may not exercise jurisdiction over the protest because Acuity challenges the award of a task order, thereby falling under the FASA task-order bar of 41 U.S.C. § 4106(f)(1). Second, they contend that Acuity lacks standing because it cannot establish its status as an "interested party" in the procurement as required by 28 U.S.C. § 1491(b)(1). KBR separately also argued that Acuity waived its ability to protest under *Blue & Gold Fleet*.

In its reply, the plaintiff endeavored to sidestep the defendants' grounds for dismissal by narrowing its claim: its protest should not be barred because it challenges only the administration of the MedSSI task order, and not the task order's issuance or award. Specifically, Acuity's challenge concerns "the [a]gency's erroneous direction to the awardee that Acuity cannot participate, even as a firewalled subcontractor, in any capacity" in the MedSSI task order, which provides many critical medical services beyond drug testing. (ECF 34 at 5-6.) The plaintiff does not seek to upset the contract award, it insists, but rather challenges, "going forward, the [a]gency's irrational refusal to bar [sic] Acuity from participating at all in any capacity based on the flawed OCI determination." (*Id.* at 8.)

        **B.**    **Waiver under *Blue & Gold Fleet***

Under *Blue & Gold Fleet*, an offeror that perceives a "deficiency or problem in a solicitation" may not "wait to see if it is the successful offeror before deciding to challenge the procurement." 492 F.3d at 1314. Instead, it must "raise the objection in a timely fashion." *Id.*

KBR argues that Acuity was on notice of all the issues of which it now complains prior to the task order's award in May 2024. (ECF 33 at 25.) KBR argues that Acuity "knew about the [c]ontracting [o]fficer's OCI and exclusion decision on or about March 13, 2024." (*Id.*) KBR emphasizes that Acuity "responded to the [a]gency's OCI concerns on March 19, 2024," and it "obtained a copy of the exclusion notice" sometime before Acuity's counsel quoted from the notice in an email to State on April 8, 2024. (*Id.* at 25-26.)

In response, Acuity explains that the timing of its knowledge of the OCI determination and the incorporation into the solicitation of the exclusion of WPS-III contractors and their affiliates does not affect the timeliness of its protest; the protest, Acuity asserts, could not have been brought at the time it learned of the OCI determination. Acuity admits that it is not an actual or prospective bidder to the MedSSI task order and was ineligible to protest the solicitation while the solicitation was ongoing. (ECF 34 at 26.) Acuity argues that it is only after, and because of, the decision in *Percipient.ai* that its protest is viable because that decision allows a potential subcontractor, like Acuity, to challenge the administration of a contract. which Acuity claims to do here, without challenging the contract's issuance or award. (*Id.*)

Setting aside whether the plaintiff's challenge to the task order is truly one of contract administration, Acuity is correct that it could not have mounted this challenge prior to the decision in *Percipient.ai*. In addition, at oral argument KBR acknowledged that Acuity's claim is not barred by *Blue & Gold Fleet* given how Acuity narrowed the relief it was seeking in its reply brief. Acuity's claim is thus timely.

### C. Standing for Subcontractors

It is an irreducible minimum that a plaintiff in federal court must demonstrate it has standing before a court may entertain the plaintiff's suit. Although the Court of Federal Claims is an Article I court, it "applies the same standing requirements enforced by other federal courts created under Article III." *Starr Int'l Co. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) (cleaned up). To establish standing under Article III, a plaintiff must demonstrate that it has suffered an injury causally connected to an action of the defendant and redressable by the hearing court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The injury must be "actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up).

In addition, as noted above, a plaintiff in a bid protest under 28 U.S.C. §1491(b) must also demonstrate that it has statutory standing, *i.e.*, that it is an "interested party." *See Weeks Marine, Inc.*, 575 F.3d at 1359. Courts have consistently held that subcontractors do not have standing to bring a bid protest as an "interested party." *See AFGE*, 258 F.3d at 1302. This conclusion flows from the fact that potential subcontractors are, by definition, not actual or prospective bidders or offerors under the definition of "interested party" the Federal Circuit adopted in *AFGE*.

To evade the normal bar on subcontractor standing, Acuity relies on *Percipient.ai* to assert its standing as a prospective subcontractor. The Federal Circuit held in *Percipient.ai* that standing in a protest extends to a prospective subcontractor when it has "a substantial chance of being [hired] to meet the needs of the agency had the violations not occurred." 104 F.4th at 853.

11

According to Acuity, that holding applies to its claim. Critically, however, Acuity can point to no evidence in the record to support the application of *Pecipient.ai*'s legal theory to its claim. Acuity is not a subcontractor or even a prospective subcontractor with "a substantial chance" of being selected by the awardee (here, KBR) to provide services for the MedSSI task order. In the absence of facts demonstrating that Acuity is being harmed by State's OCI decision, Acuity lacks both Article III standing and statutory standing.

Acuity lacks standing under Article III because its alleged injury is hypothetical. In its reply brief, Acuity narrowed its claim to conform it more closely to the type of contract-administration claim recognized in *Percipient.ai*. To avoid the FASA bar, the plaintiff's purported contract-administration challenge seeks to invalidate State's OCI determination while leaving the MedSSI task order award to KBR in place. Acuity argues that it could then participate in the task order work as a subcontractor to KBR, subject to proper mitigation. KBR was awarded the task order in part by showing that its proposed subcontractor had obtained commitments from Acuity's top two managers on the MSSI contract and was trying to retain all of Acuity's other current MSSI employees. (*See* AR 1676-77.) There is no evidence that KBR has any interest in subcontracting with Acuity or that KBR would subcontract some portion of the task order work to Acuity but for State's OCI decision.

Acuity's aspiration that it can participate in the task order at some point in the future as KBR's subcontractor is inadequate to give it standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up) (emphasis in original) (the "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient"). KBR has a current subcontractor to perform on the task order it has been awarded. At a minimum, for Acuity to have a chance of performing under the MedSSI task order, KBR's current subcontractor, already approved by State in awarding the task order, would need to fail to perform under the task order and its contract with KBR. Essentially, Acuity's claimed Article III injury here is that State's OCI determination prevents Acuity from participating in the task order as KBR's "Plan B" if the current subcontractor fails to perform. The record evinces no reason to think KBR's subcontractor is unable to perform or will fail to perform. Acuity posits that KBR's subcontractor may not succeed in hiring all of Acuity's current MSSI personnel, and that KBR will need to look elsewhere for a provider of the services; that conjecture is speculative and there is no reason to think it likely or realistic. The record also does not reflect how many other potential providers of such services might be able to perform if KBR ever did need to replace its current subcontractor. Finally, the record is devoid of any evidence regarding any prior or current relationship between Acuity and KBR to hint that Acuity would have "a substantial chance" of being KBR's partner on the MedSSI task order in the future. Acuity's challenge that State's OCI determination dashes its hope of someday being

hired as KBR's "Plan B" subcontractor falls far short of the "imminent" injury required for Article III standing to challenge the administration of the MedSSI task order.[4]

In effect, any opinion regarding the administration of the MedSSI task order could not affect Acuity's existing rights or opportunities. A ruling on a claim brought by a plaintiff that lacks standing would be an advisory opinion. *See Glob. K9 Prot. Grp., LLC v. United States*, 169 Fed. Cl. 116, 160 (2023). Advisory opinions involve "questions that cannot affect the rights of litigants in the case before them," *North Carolina v. Rice*, 404 U.S. 244, 246 (1971), and are generally beyond the scope of federal judicial authority to resolve cases or controversies. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) (cleaned up) ("it is quite clear that the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions").

Moreover, even if Acuity could prove it has standing under Article III, it cannot establish statutory standing under the bid-protest standing requirements of 28 U.S.C. § 1491(b)(1).

Acuity cannot meet the subcontractor-standing requirements established in *Percipient.ai* because it invokes the third prong of 28 U.S.C. § 1491(b)(1) as the basis for jurisdiction alongside, rather than to the exclusion of, the first and second prongs. Acuity alleges that the contracting officer violated FAR 9.5 in determining that an immitigable OCI prevented it from participating in the MedSSI task order, but that allegation comes with a prayer for relief that would render the task order invalid and require its reissuance. Thus, despite its framing of its challenge as one of only "contract administration," Acuity effectively invokes the first prong for jurisdiction under § 1491(b)(1) in addition to the third.

Further, Acuity alleges a violation of the FAR, not a violation of either 10 U.S.C. § 3453, at issue in *Percipient.ai*, or its civilian equivalent, 41 U.S.C. § 3307. While the Federal Circuit's holding on subcontractor standing is not necessarily limited to the statutory preference for commercial items at issue in the case, the *Percipient.ai* majority itself limited its holding to the allegation of a violation of 10 U.S.C. § 3453. The justification for such a limitation is obvious: that statute directs agencies to use commercial sources of supply, and Percipient.ai challenged the agency's failure to use, or to require its contractors to use, its commercially available product. The contractor in *Pecipient.ai* had a legal obligation, ongoing through the administration of the contract, to prefer commercially available products.

---

[4] Although Acuity lacks Article III and statutory standing to protest this procurement, it may still be able to seek judicial review of State's allegedly erroneous OCI determination in a district court under the Administrative Procedure Act. Acuity is alleging illegal agency action, and as narrowed in its briefing, is not seeking to undo the award of the MedSSI task order. In other words, Acuity seems to present on its face the prototypical APA claim challenging State's determination that Acuity has an OCI that cannot be mitigated. *See Validata Chem. Servs. v. United States Dept. Energy*, 169 F.Supp.3d 69, 82-83 (D.D.C 2016) (holding that district courts may hear APA claims related to government procurements).

13

Here, Acuity is not attempting to enforce a statute or regulation that imposes an ongoing legal obligation on an agency or its contractors. The presence of a continuing obligation is key to understanding *Percipient.ai.* Here, Acuity challenges State's one-time OCI decision under FAR 9.5. The FAR's OCI provisions are broadly applicable to all acquisitions, *viz.*, the obligation that agencies avoid OCIs. State's OCI determination was a one-time determination applicable to a single solicitation. Once that solicitation concluded in an award of the task order, the OCI determination had no continuing effect on the awardee or anyone else.[5] To allow a subcontractor to obtain standing for a challenge to an agency's decision that has no continuing effect on the awardee of a contract would render either ineffective or nugatory the Federal Circuit's express limitation on the scope of *Percipient.ai*, putting entirely aside the Article III standing defects.

Acuity's argument would have the *Percipient.ai* exception swallow the *AFGE* rule. Acuity's reading of *Percipient.ai* suggests that the Federal Circuit overruled precedent that had previously stood in the way of Percipient.ai's standing as a subcontractor, and any case alleging a violation of law under the third prong of § 1491(b)(1) may now be brought by a subcontractor. The *Percipient.ai* court arrived at its holding, however, by explaining how prior cases forbidding subcontractor standing, like *AFGE*, were distinguishable from the specific claim raised by Percipient.ai. The distinctive legal and factual features there are not present here.

Although Acuity tries to wriggle into the narrow gap created by *Percipiant.ai* for subcontractor standing, the applicable standard is the one typically employed: *AFGE*'s "interested party" standard. Under that standard, subcontractors generally do not have standing. Without *Percipient.ai*, the traditional test for bid-protest standing shows that Acuity is not an interested party and does not have statutory standing, even assuming Acuity could meet Article III prerequisites.

Acuity is neither an actual nor a prospective offeror for the MedSSI task order. It intended, instead, to partner with a prospective offeror to serve as a subcontractor if its partner was awarded the task order. Acuity had two possible DiPSS-awardee partners through which to become a subcontractor, but neither ultimately submitted a proposal for the task order. Acuity's first option, DiPSS Contractor 1, did not submit a proposal despite signaling initial interest in the task order, because it determined that it could not meet the task order's experience requirements. (AR 616.) Acuity's second option, DiPSS Contractor 2, also failed to submit a proposal. It submitted questions and responded to questions from the contracting officer but neither submitted a proposal nor explained its failure to do so. Nothing in the administrative record

---

[5] The holding here is, of course, limited to the facts of this protest. Under different facts, a different result might have been reached. For example, had Acuity held a DiPSS IDIQ contract eligible to submit a proposal for the MedSSI task order but had been excluded due to State's OCI determination, a different standing analysis would have been applied, if Acuity would have brought a timely challenge.

suggests that the agency's OCI determination prevented either of Acuity's proposed DiPSS contractors from submitting a proposal.[6]

Neither of the DiPSS contractors was an actual offeror for purposes of standing, because neither submitted a proposal for the task order. Acuity's two routes to becoming a subcontractor, either one more concrete than any potential subcontracting relationship with KBR, were both foreclosed even before State's May 19, 2024, final OCI determination. Further, there is no evidence that State's OCI determination affected KBR's subcontracting decision. Accordingly, Acuity cannot demonstrate that State's OCI determination harmed any substantial chance Acuity may have had at being engaged as a subcontractor on the MedSSI task order.

In sum, Acuity's interests here are too contingent and speculative to demonstrate Article III standing. In the alternative, assuming for the sake of argument that Acuity's alleged injury were sufficient for Article III purposes, Acuity has no "direct economic interest" in the award of the task order for statutory standing pursuant to 28 U.S.C. § 1491(b). *See Rex Serv. Corp.*, 448 F.3d at 1307 (to have statutory standing, a party must "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest"). Acuity's challenge fails the traditional test for "interested party" standing because it was not an actual or prospective bidder for the task order, and the novel pathway to standing established by *Percipiant.ai* is not applicable to Acuity's claim.

### D. The FASA Task-Order Bar

In *Percipient.ai*, having concluded the plaintiff had standing to pursue its protest, the Federal Circuit had to wrestle with whether FASA's bar on protesting the award of a task order nevertheless required dismissal. As noted, the majority concluded that Percipient.ai could overcome the task order bar under the facts alleged there. *Percipient.ai,* 104 F.4th at 847-48. Here, unlike in *Percipient.ai*, Acuity cannot show that it has both the constitutional and statutory standing necessary to maintain this protest. Accordingly, the issue of whether Acuity could overcome FASA's task-order bar need not be addressed. Because of the novelty of the issue, the question of whether Acuity's challenge falls within the exception created by *Percipient.ai* to the task-order bar should await a case in which the issue may be determinative of the outcome.

## VI. CONCLUSION

The plaintiff has failed to allege sufficient facts to show it has standing as an interested party to the MedSSI task order. Acuity's protest must be dismissed under RCFC 12(b)(1), 12(b)(6), and 12(h)(3).

---

[6] Had the record shown that either or both of Acuity's possible partners did not submit an offer due to Acuity's exclusion as a possible subcontractor, Acuity may have presented a stronger case for being an interested party, but on this record Acuity cannot succeed.

The plaintiff's motion for judgment on the administrative record is denied. The defendant's and defendant-intervenor's motions to dismiss are granted, and their cross-motions for judgment on the administrative record are denied as moot. A separate order filed concurrently with this opinion will direct the entry of judgment.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**